## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CURTIS ANTHONY YOUNG,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:23-cv-01839** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **MS. SPYKER,** *et al.*, | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Presently before the court are Defendants' motions to dismiss the complaint filed by pro se Plaintiff Curtis Anthony Young ("Young") for failure to state a claim upon which relief may be granted and a motion filed by Young that is styled as a motion for leave to amend but is in practice a concession to the dismissal of claims against several Defendants. For the reasons that follow, the court will grant Young's motion to the extent that it seeks voluntary dismissal of his claims against several Defendants, grant the motion to dismiss filed by Defendant Cousins, and grant in part and deny in part the motion to dismiss filed by the other Defendants.

## I.       Background and Procedural History

Young is currently incarcerated in SCI-Rockview but was incarcerated in SCI-Huntingdon at all relevant times. He filed his complaint on October 31, 2023, and the court received and docketed it on November 7, 2023. (Doc. No. 1.) According to the allegations in the complaint, Young has been diagnosed with antisocial personality disorder and was sentenced in an earlier criminal proceeding

to a verdict of guilty but mentally ill ("GBMI").  (*Id.* at 6.)  The complaint alleges

that on May 31, 2023, Defendants Spyker, Strait, and Helsel came to Young's cell

and told him that because of his repeated failures to attend meetings with SCI-

Huntingdon's Program Review Committee ("PRC"), he was going to be moved

from his current cell to the prison's Restricted Housing Unit ("RHU").  (*Id.* at 7.)

Young replied that he was a "D-Code."[1]  (*Id.*)  Defendant Spyker then allegedly

told Young, "you['re] not a real D-Code you['re] only one because of your GBMI

sentence you don't have a diagnosis."  (*Id.*)  Young informed Spyker that he had

been diagnosed with antisocial personality disorder.  (*Id.*)  Spyker purportedly

responded that Young was "moving to the RHU willingly or by force."  (*Id.*)

Spyker and Strait then left the cell, at which point Helsel spoke to Young and told

him that it was the "first time" he had ever "seen anything like this."  (*Id.*)  Helsel

told him that he should "just move to avoid what's coming."  (*Id.*)  Young asked

him what was coming and Helsel stated that Young should "just move."  (*Id.*)

Later that day, Defendant Wendle came to Young's cell and informed him

that he had spoken with Spyker twice to ask if she was sure that she wanted to

move a D-Code inmate to the RHU and that Spyker confirmed that she wanted to

do so.  (*Id.*)  Young asked Wendle if he could talk to the superintendent, Defendant

---

[1] The court infers from the complaint that "D-Code" is a housing classification
given to inmates with mental illnesses.

Revello, on his behalf, but Wendle allegedly responded, "who do you think approved this[?]" (*Id.*) Wendle implored Young to "just move to the RHU now[,] file paperwork, [and] you'll win and be moved back because D-Codes are not suppose[d] to be in the RHU." (*Id.*) Young replied that he would rather die than live in the RHU. (*Id.*) Wendle then stated that he and some other officers were going to prepare to move Young to the RHU and that they would be back to do so shortly. (*Id.*) Wendle then stated, "when we come back please don't hurt none of my guys Young." (*Id.*)

Defendant Johnson and other officers subsequently came to the cell and informed Young that they were going to move him to the RHU. (*Id.* at 8.) Young walked back into the cell where he had a "ripped sheet string tied to [his] door." (*Id.*) Young allegedly unwrapped the string, tied it around his neck, and lunged forward in an attempt to commit suicide by "snap[ping]" his neck. (*Id.*) One of the officers outside of his cell immediately pepper-sprayed Young and yelled for him to be handcuffed. (*Id.*) The officers opened the cell door and entered. (*Id.*) Johnson allegedly yelled for someone to get the "cut tool" so Young could be cut down. (*Id.*) Before anyone could do so, however, Defendant Bollinger allegedly began pulling on the string to try to "pop it." (*Id.*) After "3-4 hard tugs," the string popped off the door. (*Id.*)

Young was transported from his cell to a "strip cage." (*Id.*) Young yelled that he could not breathe. (*Id.*) Johnson told Young that he was going to be cleaned up, but Young yelled "no!" (*Id.*) Johnson then called for someone to bring him the cut tool, an officer cut the string off Young's neck, and members of the prison's medical staff cleaned Young up. (*Id.*) Young asked Johnson where he was going to be taken and Johnson told him that he was going to the RHU. (*Id.*) Young responded by ramming his face into the strip cage wall three times and stated, "I'd rather die than live in the RHU." (*Id.*) Young was again pepper-sprayed by an unnamed officer and transported to "POC." (*Id.*)

On June 1, 2023, Defendants Spyker and Strait came to Young's cell. (*Id.*) Young asked why he was being moved to the RHU and reminded them that he had been diagnosed with a mental illness. (*Id.*) Spyker allegedly told Young that he had been moved because he was being disruptive, yelling, and kicking his cell door. (*Id.*) Young said that this was a lie and that he had not been disruptive, but Spyker reiterated that this was why he was being moved to the RHU. (*Id.*)

Later that day, Defendants Sisto and Cousins came to Young's cell. (*Id.* at 9.) Young asked them why he had been moved since he was supposed to be housed in the Diversionary Treatment Unit ("DTU"), a housing unit used for inmates needing mental health treatment. (*Id.*) Defendants allegedly told him that contrary to his belief he did not have a D-Code. (*Id.*) Young stated that he had

4

been diagnosed with antisocial personality disorder and that he had been convicted GBMI. (*Id.*) Sisto replied that Young's GBMI conviction was the only reason he had been housed in the DTU. (*Id.*) Young then stated that he was a D-Code and that he was supposed to be housed in the DTU. (*Id.*) Sisto allegedly responded, "you['re] not a D-Code you have no D-Stability Diagnosis." (*Id.*) Young asked if it was true that Defendant Rivello—the prison's superintendent—knew that he had been transferred from the DTU to the RHU. (*Id.*) Sisto replied, "yes and so does the whole administration[.] You can fight this if you want but you['re] not going back to the DTU—you should [have] never been over there." (*Id.*) Young stated that other Defendants had told him he was moved because he was disruptive, but Sisto told him, "no Young[,] you were moved because you['re] not a real D-Code." (*Id.*) Later on June 1, 2023, officers threatened to pepper-spray Young if he did not comply with moving to the RHU. (*Id.*) He complied, was handcuffed, and was then taken to the RHU. (*Id.*)

On June 17, 2023, Young spoke with a nurse named "Gabby" and told her that he was having suicidal thoughts because of his placement in the RHU. (*Id.* at 10.) Gabby called Defendant Cousins, a psychiatrist in the prison, to the cell. (*Id.*) Young told Cousins that he was not supposed to be housed in the RHU. (*Id.*) Cousins stating that moving him to the RHU was not a decision made by the prison's psychiatry staff but rather by the PRC and instructed Young to go back to

the PRC if he wanted to be moved out of the RHU. (*Id.*) The PRC informed

Young on June 21, 2023 that he was going to be moved out of the RHU. (*Id.* at

11.) The complaint alleges that during Young's time in the RHU and in the

months that followed his release from the RHU, several members of the prison's

staff expressed to him their belief that supervisory authorities in the prison were

housing Young in the RHU based on personal animosity towards him and that he

should not have been housed in the RHU. (*See id.* at 10-14.) The complaint

asserts claims for cruel and unusual punishment in violation of the Eighth

Amendment and for violation of Title II of the Americans with Disabilities Act

("ADA"). (*Id.* at 19.) The court liberally construes the complaint as additionally

asserting an excessive force claim against Defendants Bollinger and Johnson

arising from the incident in which they allegedly forcefully removed the string

from Young's neck on May 31, 2023. Young requests $2.5 million in damages

and injunctive relief requiring the Defendants to transfer him to a different prison

and to remove Defendants from their jobs. (*Id.*)

      Defendant Cousins moved to dismiss the complaint on February 5, 2024.

(Doc. Nos. 21-22.) Defendants Rivello, Kohler, Spyker, House, Loy, Strait,

Wendle, Long, Johnson, Conway, Helsel, Sisto, Laborde, Bollinger, Britney Koch

(identified in the complaint as "Ms. Brittany"), and Varner ("Corrections

Defendants") moved to dismiss the complaint on February 6, 2024, and filed a

supporting brief on February 9, 2024.  (Doc. Nos. 23, 25.)  Young filed a brief in

opposition to the Corrections Defendants' motion on March 25, 2024.  (Doc. No.

28.)  Young then filed a "motion for leave to file an amended complaint."  (Doc.

No. 29.)  Young does not include a proposed amended complaint with the motion

or otherwise argue that the substance of his complaint should be amended; instead,

he simply concedes that all claims against Defendants Sisto, Cousins, Conway,

Varner, Koch, Long, and Laborde should be dismissed for lack of personal

involvement in the alleged civil rights violations.  (*Id.*)  Young's motion and both

motions to dismiss are now ripe for review.

## II.    Legal Standards

### A.    Motion to Dismiss, Federal Rule of Civil Procedure 12(b)(6)

When ruling on a motion to dismiss under Rule 12(b)(6), the court must

accept as true all factual allegations in the complaint and all reasonable inferences

that can be drawn from them, viewed in the light most favorable to the plaintiff.  *In

re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).  The court's

inquiry is guided by the standards of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544

(2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Under *Twombly* and *Iqbal*,

pleading requirements have shifted to a "more heightened form of pleading."

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  To prevent

dismissal, all civil complaints must set out "sufficient factual matter" to show that

the claim is facially plausible.  *Id.*  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct.  As the Supreme Court instructed in *Iqbal*, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under *Twombly* and *Iqbal*, the United States Court of Appeals for the Third Circuit has identified the following steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,

998 F.2d 1192, 1196 (3d Cir. 1993)).  A court may also consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d Ed. 2004)).

In the context of *pro se* prisoner litigation specifically, the court must be mindful that a document filed *pro se* is "to be liberally construed."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers."  *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## B.    Civil Rights Statute, 42 U.S.C. § 1983

Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials.  *See* 42 U.S.C. § 1983.  The statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.* "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." *See Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002)).  To state a cause of action under Section 1983, a plaintiff must allege that: (1) the conduct complained of was committed by persons acting under color of state law; and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States.  *See Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

## III.  Discussion

At the outset, the court will grant Young's motion for leave to amend to the extent that it seeks to voluntarily dismiss his claims against Defendants Sisto, Cousins, Conway, Varner, Koch, Long, and Laborde.  The court will likewise grant Defendant Cousins's motion to dismiss given that Young concedes that the claims against Cousins should be dismissed.  Young's motion for leave to amend will otherwise be denied to the extent that it seeks leave to file an amended complaint because Young has not filed a proposed amended complaint with the motion.  *See Lake v. Arnold*, 232 F.3d 360, 374 (3d Cir. 2000) (noting that motion for leave to amend is properly denied for plaintiff's failure to file a proposed

amended complaint because without a proposed amended complaint the court "cannot evaluate the merits" of the motion for leave to amend).

Turning to the remaining motion to dismiss, Corrections Defendants assert three arguments for dismissal of the complaint: (1) Defendants Kohler, Loy, Koch, and Varner should be dismissed from the case for Young's failure to allege their personal involvement; (2) the complaint fails to state a cruel and unusual punishment claim upon which relief may be granted; and (3) the ADA claim fails as a matter of law because there is no individual liability under Title II of the ADA. The court will analyze these arguments in reverse order.

As an initial matter, the court agrees with Corrections Defendants that the dismissal of the ADA claim is appropriate. Although the United States Court of Appeals for the Third Circuit "has not squarely addressed the question of whether claims may be brought against government officers in their individual capacities under Title II of the ADA," *Durham v. Kelley*, 82 F.4th 217, 224 n.12 (3d Cir. 2023), courts in this district and unpublished decisions from the Third Circuit have consistently found that there is no individual liability under the ADA. *See, e.g.*, *Scott v. Pa. Dep't of Corrs.*, No. 3:24-cv-00335, 2024 WL 1916725, at *4-5 (M.D. Pa. May 1, 2024) (collecting cases); *Snider v. Pa. DOC*, 505 F. Supp. 3d 360, 405-06 (M.D. Pa. 2020). The court agrees with the reasoning of these courts and will

accordingly dismiss the ADA claim with prejudice because there is no individual liability under the ADA.

Turning to the cruel and unusual punishment claim, the Corrections Defendants argue that the complaint fails to state a claim upon which relief may be granted because there is no allegation that Young' placement in the RHU caused him to not receive mental health treatment and his claims instead seem to be based on a disagreement as to how his mental health was treated.  (Doc. No. 25 at 8-9.)

The court disagrees.  Contrary to Defendants' argument, the court does not construe the complaint as asserting a claim based on the denial of mental health treatment, but rather as asserting that Defendants placing Young in the RHU when they knew that he had a mental illness was cruel and unusual punishment.  The court finds that the complaint states a claim upon which relief may be granted under this theory.  Young alleges: (1) that Defendants knew that he had a diagnosed mental illness; (2) that they transferred him to the RHU; and (3) that his placement in the RHU caused his mental health to deteriorate.  This is sufficient to allege a violation of the Eighth Amendment.  *See Clark v. Coupe*, 55 F.4th 167, 178-85 (3d Cir. 2022).

As noted above, the court additionally liberally construes the complaint as asserting an excessive force claim against Defendants Bollinger and Johnson.  To state an excessive force claim, a plaintiff must allege that prison officials used

force "maliciously and sadistically for the very purpose of causing harm." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 193 (3d Cir. 2021) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).  Courts must consider whether force was "applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  Several factors inform this analysis, including:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response.

*Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) (quoting *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000)).

Here, Young alleges that Bollinger and Johnson entered his cell to respond to his suicide attempt and, rather than using a "cut tool" to safely remove the string from his neck, Bollinger forcefully yanked on the string several times, causing injuries to Young's neck.  (Doc. No. 1 at 8.)  The court finds that this is sufficient to allege that Bollinger and Johnson used excessive force in violation of the Eighth Amendment.

Turning to Corrections Defendants' personal involvement argument, to state a claim under Section 1983, a plaintiff must sufficiently allege that each defendant was personally involved in the act or acts that he claims violated his federally

protected rights. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Rode*, 845 F.2d at 1207). The defendant's personal involvement cannot be based solely on a theory of *respondeat superior*. *Rode*, 845 F.2d at 1207.

Corrections Defendants seek dismissal of the claims against Defendants Kohler, Loy, Koch, and Varner for failure to allege personal involvement. (Doc. No. 25 at 6.) The court will summarily dismiss the claims against Koch and Varner—along with Sisto, Conway, Long, and Laborde—because Young concedes that his complaint fails to allege their personal involvement. (Doc. No. 29.) The court additionally agrees with Corrections Defendants that the complaint fails to allege the personal involvement of Kohler and Loy because they are not alleged to have participated or acquiesced in the alleged civil rights violations in any way. (*See* Doc. No. 1.)

Finally, Corrections Defendants note that Plaintiff has filed a waiver of service form addressed to "Correctional Officer Sprankle," despite not formally naming this individual as a defendant. (*See* Doc. No. 25 at 6 n.4.) Corrections Defendants request that the court screen any claims asserted against this individual

14

pursuant to 28 U.S.C. § 1915A before formal service is effectuated on him because the complaint fails to allege his personal involvement in the alleged civil rights violations.  (*Id.*)

To the extent Young intends to name Sprinkle[2] as a defendant, the court agrees that screening of the claims against him is appropriate pursuant to 28 U.S.C. § 1915A.[3]  The only allegations pertaining to Sprinkle are that he had three conversations with Young in which he expressed his belief that Young should not have been transferred to the RHU and that officials in the prison were wrongfully targeting Young for negative treatment.  (*See* Doc. No. 1 at 10-14.)  There are no allegations that Sprinkle was personally involved in transferring Young to the

---

[2] The court liberally construes the reference to "Sprankle," (*see* Doc. No. 20 at 1), as a reference to the individual identified as "Sprinkle" in the factual allegations of the complaint.

[3] 28 U.S.C. § 1915A provides:

> (a) Screening.--The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
> (b) Grounds for dismissal.--On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint--
>> (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
>> (2) seeks monetary relief from a defendant who is immune from such relief.

RHU or in the alleged use of excessive force immediately prior to his transfer to the RHU. The claims against Sprinkle will accordingly be dismissed.

In sum, the court will dismiss Young's claim alleging violation of Title II of the ADA against all defendants and will additionally dismiss his Eighth Amendment claims against Defendants Cousins, Koch, Varner, Sisto, Conway, Long, Laborde, Kohler, Loy, and, to the extent he is named as a defendant, Sprinkle.

Before dismissing a civil rights complaint for failure to state a claim upon which relief may be granted, a district court must permit a curative amendment unless the amendment would be inequitable or futile. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). The court finds that amendment of the ADA claim would be futile because that claim fails as a matter of law. The court cannot conclude, however, that amendment of the Eighth Amendment claims against the dismissed Defendants to more clearly state how they were personally involved in the alleged civil rights violations would be inequitable or futile. The court will accordingly grant Young leave to file an amended complaint.

## IV.   Conclusion

For the foregoing reasons, Young's motion for leave to amend will be granted to the extent that it seeks voluntary dismissal of his claims against several Defendants, Defendant Cousins's motion to dismiss will be granted, and the DOC

16

Defendants' motion will be granted in part and denied in part.  An appropriate order follows.

s/ Sylvia H. Rambo
United States District Judge

Dated: May 23, 2024