UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

CURTIS ANTHONY YOUNG,

      Plaintiff,

      v.

MS. SPYKER, *et al.*,

      Defendants.

CIVIL ACTION NO. 1:23-cv-01839

(SAPORITO, J.)

## MEMORANDUM

Curtis Anthony Young, formerly incarcerated at SCI-Huntingdon, alleges that seven defendants affiliated with the prison violated his Eighth Amendment rights when he was transferred to the Restricted Housing Unit for 20 days. All parties have moved for summary judgment on Young's excessive force and conditions of confinement claims. Because he did not exhaust administrative remedies as to his excessive force claim, and the record shows that the defendants did not violate his Eighth Amendment rights, the Court grants summary judgment to the defendants.

## I.  BACKGROUND

Young proceeds on an amended complaint (Doc. 35), which concerns his temporary transfer from the Diversionary Treatment Unit ("DTU"), a

unit designed for inmates with mental illnesses, to the RHU at SCI-Huntingdon in June 2023. In relevant part, the complaint alleges as follows: Young suffers from antisocial personality disorder and was classified as a "D-Code"[1] inmate within the Pennsylvania Department of Corrections ("DOC"). Given his mental illness, he objected to being placed in the RHU, and when officers arrived to forcibly move him, he allegedly tried to hang himself with a string tied to his cell door.

Defendants Lt. Johnson and CO Bollanger were among a team of officers who intervened in his suicide attempt. Young alleges that the officers were not carrying a "cut-off tool" that is used to remove string during a suicide attempt and that DOC policy required them to carry. Instead, Bollanger allegedly "yanked" the string from the door frame, causing Young to repeatedly hit his head on the cell door. Because of the absence of the cut-off tool, there was a further delay before the string was fully removed from Young's neck, during which he repeatedly yelled "I can't breathe."

---

[1] Within the DOC, the D Stability Code generally "applies to inmates who have the most significant mental health needs," and "entitles them to the greatest amount of mental health resources available." *Dooley v. Wetzel*, 957 F.3d 366, 370 (3d Cir. 2020) (citations omitted).

After this incident, and despite his continual protests and threats that he would rather "die in the DTU . . . [than] go to the RHU," Young was transferred to the RHU for 20 days. He alleges that the RHU was not an "appropriate setting" for him to receive mental health care, and that he suffered "paranoia, anxiety, [and] full blown stress."

Defendants' motion to dismiss the operative complaint was granted in part. Young was ultimately permitted to proceed on Eighth Amendment excessive force claims against Johnson and Bollanger, and Eighth Amendment conditions of confinement claims against five other defendants who allegedly had a "strong say-so" in transferring Young to the RHU. *See* (Docs. 69, 70). The parties have now moved for summary judgment.

## II.  LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a

reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477

U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## III.    MATERIAL FACTS

The summary judgment record[2] reveals the following material facts: Between May 18, 2023, and December 28, 2023, Young was incarcerated at SCI-Huntingdon, where the events relevant to this case occurred. Young was in prison for assaulting a guard during a prior sentence, for which he was adjudicated guilty but mentally ill ("GBMI").

---

[2] Young's summary judgment filings do not respond directly to defendants' statement of material facts, and cite inconsistently to supporting evidence, including numerous references to evidence that is not present in the record. *See* (Docs. 51, 52, 72). Any factual allegations in these filings are not competent evidence at the summary judgment stage unless supported by evidence in the record. *See* Fed. R. Civ. P. 56(c)(1). Nonetheless, in evaluating the parties' motions, the Court has reviewed and considered all the evidence the parties have submitted. *See* Fed. R. Civ. P. 56(c)(3) (in addition to properly cited materials, the court "may consider other materials in the record"). Where Young has not presented competent evidence to demonstrate a genuine dispute of material fact, defendants' fact statements are deemed admitted. *See* Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1.

The DOC diagnosed him with antisocial personality disorder and classified him as a D-Code inmate. *See generally* (Doc. 67-10).

This case concerns Young's June 1, 2023, transfer from the Diversionary Treatment Unit ("DTU") to the Restricted Housing Unit ("RHU"), where he remained for 20 days. In general, the RHU is a unit intended for inmates placed in administrative or disciplinary custody. The DTU is intended for inmates with mental illnesses who "may need to be placed a secure housing unit or setting," but not to be "exposed to Restrictive Housing." Inmates in the DTU "are immediately scheduled and offered . . . a minimum of 20 hours out-of-cell programming per week." If a DTU inmate is temporarily moved to the RHU, the DTU programming is made available to them in the RHU. *See* DOC Policy Statement 13.8.1, Access to Mental Health Care Manual (§ 14.A, Glossary); (Doc. 67-10 at 57).

### A. Transfer to RHU

On May 26, 2023, Young was involved in a fight with an inmate in the general population and ignored orders to stop, for which he received disciplinary charges. On May 30, in the DTU, he refused an order to meet with security staff and used obscene and abusive language toward staff,

for which he received additional charges. *See* (Doc. 67-2 (Young Dep. 12:1-7); Docs. 67-3, 67-4).

With these charges pending, Young's Program Review Committee ("PRC")[3] determined that Young would be moved from the DTU to the RHU on May 31, 2023.[4] The DOC's records indicate that on the morning of May 31, in the DTU, Young appeared "quiet," and accepted meals and medication, but refused exercise. (Doc. 67-12 at 2). Young testified that when he learned he would be moved to the RHU, he protested and told multiple officers he would "rather die on the DTU than go live on the RHU." Young then attempted to suffocate himself using a string that he tied to his cell door. Defendants have produced video showing a team of officers, led by defendant Johnson, entering Young's cell to intervene. *See* (Doc. 68).

The video depicts as follows: Johnson ordered a team of officers to

---

[3] In general, a PRC consists of three staff members that "make[] decisions regarding continued confinement in the [RHU]," among other duties. *See* Policy Statement 13.8.1, Access to Mental Health Care Manual (Glossary).

[4] On June 1, Young received another disciplinary citation for abusive and sexually harassing language toward staff. He was ultimately found guilty on the charges from all three of these incidents. (Doc. 67-4).

deploy OC spray into Young's cell, enter the cell, and cut the string from the door. The string was cut within 15 seconds of Young's door opening.[5] Young was walked in handcuffs from his cell to a "strip cage," which took approximately 25 seconds, during which a portion of the string remained tied around his neck. After approximately 10 seconds in the strip cage, Young is heard to say: "I can't breathe," and Johnson immediately called for a "911 tool . . . get that stuff off his neck with the 911 tool please." Another officer yelled: "I'm working on it." Within 15 seconds of Young's statement that he could not breathe, an officer had cut the remainder of the string from Young's neck.

The strip cage was a rectangular enclosure that included a concrete wall. Young remained in the strip cage while he was "decontaminated" and examined by a nurse. He continued to complain to the officers about his planned transfer to the RHU. When his handcuffs were removed, he

---

[5] Young testified that no officer had the appropriate tool to cut the string, and that Bollanger yanked on the string to remove it from the door, injuring Young; however, the video plainly shows an officer using a tool to cut the string from the door. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

began repeatedly ramming his forehead and shoulder into the wall. When he refused an order to stop, an officer deployed another round of OC spray. Young was decontaminated, placed in a smock, and escorted to the medical department in a wheelchair. After one day in a psychiatric observation cell, he was ultimately transferred to the RHU.

On July 3, 2023, more than a month later, Young was examined by medical staff for a complaint of "continuous neck pain," which he attributed to the self-harm incident. He was observed to have full range of motion in his neck and no "swelling, markings, rashes [or] bruising." (Doc. 67-10 at 37-38). He was referred for a spine x-ray, which was performed on July 6, and showed "mild degenerative changes without evidence of acute fracture." (Doc. 67-11).

### B. Prison Grievance Procedure

The Pennsylvania Department of Corrections ("DOC") provides a three-part procedure for inmate grievances: initial review by a Grievance Officer, appeal to the Facility Manager, and final appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). To begin the grievance process, the prisoner must provide submit the appropriate form and provide a factual summary of the claim, identify the individuals

involved, and state the relief requested. The grievance must be submitted within 15 working days of the underlying incident. *See* (Doc. 67-5) (DC-ADM 804, § 1.A). If the grievance is denied, "[o]nly an issue that was raised for initial review . . . may be appealed." (*Id.*, § 2.A.c).

On June 13, Young submitted a lengthy and prolix grievance (No. 1038415), which was initially rejected on the grounds that it was not presented in a "legible, understandable, and courteous manner" and sought relief for issues that did not affect him and had occurred more than 15 working days before. (Doc. 67-6 at 36-38). Young resubmitted the grievance on June 17. In summary, this amended grievance alleged that the PRC had placed Young in the RHU for someone's "personal gain"; that he should not have been placed in the RHU because of his mental illness and attendant D-Code status; and that this placement reflected negligence and deliberate indifference by "every staff member on [May 31]" and caused him to attempt self-harm. The grievance did not allege excessive force during his physical extraction from his cell or discuss any alleged error in removing the string from his self-harm attempt. It did not mention defendants Johnson or Bollanger except to describe a conversation in which Johnson told Young of the decision to remove him

to the RHU. The grievance was denied on the basis that Young had been temporarily removed to the RHU for his "disruptive behavior," and that all services offered to him in the DTU remained available to him. *See* (*id.* at 30-33).

On appeal, Young essentially reiterated his prior position, but raised an additional allegation about the extraction, without naming Johnson or Bollanger: "My neck from hanging is in constant pain from the yanking of the hang string, the misplace of the self-harm cut off tool." In response, Facility Manager J. Rivello acknowledged Young's allegations of pain in his neck, but did not address the allegations of "yanking" of the string or the misplaced tool. Rivello denied the appeal on the grounds previously explained, adding: "If you continue to have pain, you should submit a sick call slip." *See* (*id.* at 25-27). In response to Young's final appeal, SOIGA affirmed on essentially similar grounds. (*Id.* at 12).

## IV.  DISCUSSION

### A. Excessive Force

Young was permitted to proceed on Eighth Amendment excessive force claims against Johnson and Bollanger. However, the record shows

that he did not exhaust administrative remedies as to these claims. Under the Prison Litigation Reform Act ("PLRA"), prisoners complaining about the conditions of their confinement must exhaust available administrative remedies before they may file suit in federal court. 42 U.S.C. § 1997e(a). The PLRA requires proper exhaustion, meaning plaintiffs must administratively grieve their claims in accordance with the procedural rules of the prison in which they are incarcerated.[6] *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). Therefore, exhaustion within the DOC requires appeal to SOIGA, the third and final step of the process. *See Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004). To exhaust remedies on a particular issue, the grievance must "alert prison officials to [the] problem," but need not "provide personal notice to a particular official that he may be sued." *Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007) (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)).

Here, Young filed a grievance complaining about the decision to

---

[6] Although Young has since been released from custody, these rules still apply to this case because he filed the operative complaint from prison. *See* (Doc. 35); *Garrett v. Wexford Health*, 938 F.3d 69, 88 (3d Cir. 2019).

move him to the RHU, but that grievance[7] did not allege excessive force by Johnson, Bollanger, or any other officer. After the grievance was denied, he made a vague statement in his appeal that could be construed as an allegation of excessive force, but the grievance policy only permits review of issues raised in the initial grievance. Therefore, the respondents did not address this allegation, and the excessive force claims were not exhausted.[8] *See, e.g., Martin v. Gearhart*, 712 F. App'x 179, 185-86 (3d Cir. 2017); *Jordan v. Murin*, No. 1:18-CV-0228, 2020 WL 8675898, at *5 (W.D. Pa. Nov. 4, 2020) ("[T]he critical inquiry for purposes

---

[7] The record also contains sick call requests dated June 11, 2023, and June 30, 2023, in which Young alleged that he was "assaulted" by "Deputy Spyker and many more," and referred to the alleged "yanking" of the string and the missing cut-off tool. *See* (Doc. 35-3 at 1-2). However, sick call requests are not grievances for PLRA exhaustion purposes. *See* DC-ADM 804, § 1.A.5, § 1.A.12 ("[T]he inmate must submit his/her grievance . . . using [Form] DC-804."); *Small v. Camden Cnty.*, 728 F.3d 265, 272 (3d Cir. 2013) ("Sick Call Requests are prospective requests for medical services, they are not retrospective complaints.").

[8] In certain circumstances, a grievance can be deemed exhausted if the prison declined to enforce its own rules and instead "fully examined [the new issue] on the merits" during the appeal process. *See Rinaldi v. United States*, 904 F.3d 257, 271 (3d Cir. 2018) (quoting *Camp v. Brennan*, 219 F.3d 279, 281 (3d Cir. 2000)). Here, the prison's responses merely reiterated that Young could seek medical care for pain in his neck; it did not address any purported claim that his pain was caused by excessive force.

of determining exhaustion under the PLRA is to determine who was named in the grievance and what claims were mentioned in the grievance, not any appeal therefrom."), report and recommendation adopted, 2021 WL 808698 (W.D. Pa. Mar. 3, 2021); *Talley v. Gilmore*, No. 2:16-CV-1318, 2018 WL 4029597, at *4 (W.D. Pa. Aug. 21, 2018) ("Talley's reliance on the language in his grievance appeals is misplaced . . . The inmate-plaintiff is required to name [the] issue or claim . . . in the operative grievance.").

Even if the Court could consider Young's claim, the record forecloses any inference of excessive force by Johnson or Bollanger. It is undisputed that the officers intervened for the legitimate purpose of stopping Young's attempt at self-harm. Contrary to Young's allegations, the string holding him to the door was cut from the door, not "yanked" back and forth while he was still attached to it. The evidence does not support an inference that the brief delays in cutting the string were imposed "maliciously and sadistically to cause harm," *Banks v. Meck*, 531 F. App'x 205, 207 (3d Cir. 2013) (quotation omitted), and the medical evidence does not indicate that Young sustained any significant injury to his neck. Accordingly, the defendants are entitled to summary judgment on this claim.

## B. Conditions of Confinement

For his Eighth Amendment conditions of confinement claim, Young would have to demonstrate that the defendants "deprived [him] of the minimal civilized measure of life's necessities" and "acted with deliberate indifference in doing so, thereby exposing [him] to a substantial risk of serious damage to [his] future health." *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017) (citations omitted). Young contends that his placement in the RHU violated DOC policy[9], but that is insufficient, because "a violation of prison policy is not equivalent to a constitutional violation."

---

[9] The Court's own review of the DOC's written policies does not clearly resolve whether Young's placement was consistent with policy. The policies provide as follows with respect to D-Code inmates:

> If an exceptional circumstance exists preventing a D Roster individual from being housed on the DTU . . . [h]e/she shall be moved to the DTU within 13 days. If circumstances prohibit the individual from being moved into a DTU within the 13-day time period, notifications will be made to the Executive Deputy Secretary, Regional Deputy Secretary, Office of Population Management (OPM), Office of Psychology, and the Office of Chief Counsel.

Policy Statement 13.8.1, Access to Mental Health Care Manual (§ 14.C.2) (internal citations omitted); *see also* DC-ADM 801 ("Inmate Discipline") (§ 4.B.4.b) (describing a similar procedure for RHU placement on disciplinary grounds for inmates with a serious mental illness). It is unclear whether that notification procedure was followed in this case.

*Washington v. Salamon*, 2022 WL 4096877, at *5 (M.D. Pa. Sept. 7, 2022) (citations omitted); *see also Holloway v. Irwin*, No. 1:23-CV-00278-SPB, 2024 WL 4980759, at *4 (W.D. Pa. Oct. 29, 2024) (alleged policy violations did not "bolster [the plaintiff's] claims because DOC policies do not create rights actionable under § 1983").

Although Young was adamant that he should not be placed in the RHU and that he would harm himself to avoid being placed there, his threats do not themselves make his placement in the RHU unconstitutional. *See, e.g., Macon v. Gressel*, No. 1:23-CV-00283-RAL, 2025 WL 1115724, at *8 (W.D. Pa. Apr. 15, 2025); *Talley*, 2018 WL 4029597, at *7 (inmate intermittently housed in RHU despite D-Code status and threats of suicide). The Court understands Young to argue that although he had access to the same mental health care and programming, his mental health suffered because the RHU was not an "appropriate setting." In his grievance appeal, he alleged:

> No matter who stops at my door . . . I believe Deputy Spyker and PRC sent them. Every day I wake up I believe the[y're] going to move me back to the RHU . . .
>
> Being on the RHU was hard on me mentally . . . the RHU environment isn't the DTU environment. Programs and activities aren't the only benefit of the DTU service[:] the calm of the unit, the colors on the walls[,] the signs

- 16 -

> speaking directly to me talking about coping with struggles of mental health 'suicide prevention' . . . even the DTU COs are trained different. The constant checking on you, the understanding when I see another inmate in blues knowing I'm not alone in the fight . . . Deputy Spyker and PRC took that away from me.

(Doc. 67-6 at 27). Accepting his point that the RHU was a more stressful environment than the DTU, Young has not presented any evidence that his health suffered significantly from being placed in the RHU for 20 days, that he was deprived any form of treatment, or that the defendants otherwise disregarded a "substantial risk of serious damage" to his health. *See, e.g., Hinton v. Houser*, No. 1:22-CV-00554, 2025 WL 2803773, at *28-29 (M.D. Pa. Sept. 30, 2025); *Hickox v. Karabinos*, No. 3:20-CV-00980, 2021 WL 1297780, at *6 (M.D. Pa. Apr. 7, 2021); *Stanford v. Walton*, No. 16-CV-1584, 2019 WL 5068666, at *14 (W.D. Pa. Oct. 9, 2019) ("[T]here is no evidence that a one-month placement in the RHU exposed Plaintiff to a particular risk because of his illness.").

The evidence that Young was moved to the RHU for legitimate disciplinary reasons[10], having abused staff and/or inmates in both the

---

[10] Young now claims that the disciplinary rationale was "fabricated" and pretextual, *see* (Doc. 51), but he presents no evidence in support of these allegations.

general population and the DTU, further belies any inference that the placement reflected reckless disregard for his health. *See Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) ("[A]s long as the conditions of confinement are not foul, inhuman or totally without penological justification[, segregated detention] may be a necessary tool of prison discipline."); *Hickox*, 2021 WL 1297780, at *5-6; *Eden v. Rivello*, No. 3:21-CV-1966, 2024 WL 1604645, at *6-7 (M.D. Pa. Apr. 12, 2024). On this record, no reasonable jury could conclude that this temporary placement violated his constitutional rights.

## V.  CONCLUSION

Accordingly, summary judgment will be granted to the defendants. An appropriate order follows.


Dated: March 3, 2026                    *s/Joseph F. Saporito, Jr.*
                                        JOSEPH F. SAPORITO, JR.
                                        United States District Judge